**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Dianne Marie AUGUST, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Daniel Valentino BADARACCO,
Defendant–Appellant.**

Nos. 95–30220, 95–30224.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 1996.

Decided June 11, 1996.

Kenneth Ricardo Perry, Portland, Oregon, for defendant-appellant Dianne Marie August.

Ellen C. Pitcher, Assistant Federal Public Defender, Portland, Oregon, for defendant-appellant Daniel V. Badaracco.

Johnathan S. Haub, Assistant United States Attorney, Portland, Oregon, for plaintiff-appellee United States of America.

Before: GOODWIN and SCHROEDER, Circuit Judges, and ARMSTRONG,* District Judge.

ARMSTRONG, District Judge:

Dianne Marie August and Daniel V. Badaracco appeal their sentences of imprisonment, arguing that the district court miscalculated their guideline range under the United States Sentencing Guidelines ("U.S.S.G.") by improperly multiplying the estimated capacity of their methamphetamine laboratory to determine the amount of methamphetamine involved in their offenses. We find that the district court did not err, and affirm the sentences imposed.

---

* Honorable Saundra Brown Armstrong, United States District Judge for the Northern District of

## I. FACTS

On March 3, 1992, Drug Enforcement Administration ("DEA") agents discovered a methamphetamine lab and three firearms while serving a federal search warrant at the appellants' home on Boyd Street in Milwaukie, Oregon ("the Boyd Street lab"). Appellants were arrested during the search. Further investigation revealed that from 1988 to 1989, appellants operated methamphetamine labs at the residence of Bill Olson ("the Olson lab") and at the residence of Rick and Sue Seaman, which was known as the "frog pond" ("the frog pond lab").

Appellants were convicted of conspiracy to manufacture, possess with intent to distribute, and to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, as well as multiple counts of possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), manufacturing methamphetamine, 21 U.S.C. § 841(a)(1), distribution of methamphetamine, 21 U.S.C. § 841(a)(1), and use of a firearm in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1).

The base offense level for all of appellants' drug convictions was determined under U.S.S.G. § 2D1.1 based on the amount of methamphetamine involved in their offenses. At the sentencing hearing, the government argued that a conservative estimate of the amount of methamphetamine involved in appellants' offenses was between three and ten kilograms. This estimate was based on the following evidence:

The capacity of the Boyd street lab was 1,750 grams to 2,650 grams per reaction based on a 3,500 milliliter reaction vessel found at the Boyd Street lab ("the flask"). There was clearly more than one reaction at the Boyd Street lab because 20 kilograms of waste material were found at that site. Further, Richard Schnazer testified at trial that he had purchased four gallons of hydriodic acid for the appellants during the period in which they operated the Boyd Street lab. According to Roger Ely, a senior forensic chemist with the DEA, four gallons of hy-

California, sitting by designation.

driodic acid will produce between 2,000 grams and 3,000 grams of methamphetamine.

Additionally, Sue Seaman testified at trial that she had observed August with a bag containing approximately three pounds (1.36 kg) of methamphetamine. Ms. Seaman also testified that she had purchased methamphetamine from the appellants at both the frog pond and Boyd street locations, and that appellants had a steady stream of customers at the Boyd street address. The government did not present any specific evidence with respect to the amount of methamphetamine associated with the Olson or frog pond labs.

The district court found that there was clear evidence that methamphetamine was produced at all three labs, and that there were at least two full reactions at the Boyd Street lab. Moreover, the court found that, as the Boyd Street lab was capable of producing a minimum of 1,750 grams of methamphetamine in one reaction, that at least 3,500 grams had been manufactured at that lab. The court concluded that this was a "very conservative finding" and that based on the Boyd Street lab capacity, the evidence of continuous sales, and the fact that methamphetamine was also produced at the other two labs, at least 3,500 grams of methamphetamine were involved in the offense.

Based on this finding, the Court sentenced appellant August to the guideline minimum 151 months of imprisonment for each of the drug offenses, to be served concurrently, and 60 months of imprisonment for the firearm offenses, to be served concurrently with each other, and consecutively to the drug offenses. Appellant Badaracco was sentenced to 240 months for each of the drug offenses, to be served concurrently, and 60 months for the firearm offenses, to be served concurrently with each other, and consecutively to the drug offenses.

Appellants appealed to this Court. We held that the trial court was within its discretion to consider both the lab capacity and the potential amount of methamphetamine produced based on the hydriodic acid. However, we found that the lab capacity was misstated in the presentence report, and that the actual lab capacity was 500–1,000 grams, not 1,750–2,650 grams. Accordingly, we remanded "for a recalculation of relevant conduct and appropriate resentencing, using the correct lab capacity." *United States v. Badaracco*, No. 93–30028, 1994 WL 41105 (Feb. 10, 1994) (memorandum disposition); *United States v. August*, No. 93–30031, 1994 WL 637146 (Nov. 7, 1994) (memorandum disposition).

On remand, the district court applied the same calculations to the correct minimum lab capacity, resulting in a finding of 1,000 grams. The district court concluded that the government had proven, by a preponderance of the evidence, that the offense involved at least 999 grams of methamphetamine.[1] Based on this finding, the district court sentenced appellant August to the guideline minimum 97 months of imprisonment for each of the drug offenses, to be served concurrently, and 60 months of imprisonment for the firearm offenses, to be served concurrently with each other, and consecutively to the drug offenses. Appellant Badaracco was sentenced to 140 months for each of the drug offenses, to be served concurrently, and 60 months for the firearm offenses, to be served concurrently with each other, and consecutively to the drug offenses. Both August and Badaracco appealed the sentences imposed on remand.

## II. STANDARD OF REVIEW

The district court's interpretation and application of the Sentencing Guidelines are reviewed de novo. *United States v. Buenrostro–Torres*, 24 F.3d 1173, 1174 (9th Cir.1994) (per curiam). Whether the method adopted by the district court to approximate the relevant quantity of drugs is proper under the guidelines is therefore reviewed de novo. *United States v. Williams*, 989 F.2d 1061, 1073 (9th Cir.1993).

---

1. After the district court concluded that the relevant amount of methamphetamine was 1,000 grams, Badaracco's counsel argued that a finding of 1,000 grams was unfair because it resulted in the application of a 20 year minimum for Badaracco and a 10 year minimum for August under 21 U.S.C. § 841(b)(1)(viii). The district court subsequently reduced this 1,000 gram calculation to 999 grams in order to avoid application of 21 U.S.C. § 841(b)(1)(viii).

## III. METHOD OF APPROXIMATING RELEVANT AMOUNT OF DRUGS

■ The sole question presented in these appeals is whether the district court's method of approximating the relevant amount of methamphetamine is permissible under the guidelines. Appellants argue that, while the district court properly took a conservative view of the lab capacity, the court erred by doubling that estimate based on the district court's finding that there was evidence of at least two incidents of manufacturing. Appellants assert that since the district court chose to rely on an approximate lab capacity, that capacity represents the "endpoint" of the district court's calculations, or in other words, the maximum amount of drugs which the district court is allowed to consider under the guidelines.

■ Although the guidelines clearly authorize the district court to approximate drug quantities, as with all factors which increase a defendant's offense level, the government is required to prove the approximate quantity by a preponderance of the evidence. *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir.1990). The district court must "conclude that the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *accord United States v. Sepulveda*, 15 F.3d 1161, 1198 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). Furthermore, the information which supports an approximation must possess "sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a); *United States v. Ortiz*, 993 F.2d 204, 207 (10th Cir.1993).

■ Additionally, since a defendant's sentence depends in large part upon the amount of drugs attributable to his conduct, and approximation is by definition imprecise, the district court must err on the side of caution in choosing between two equally plausible estimates. *See Walton*, 908 F.2d at 1302 ("when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution").

We have not specifically addressed the parameters of the district court's discretion in making approximations under U.S.S.G. § 2D1.1 application note 12. We have, however, approved several methods for making such approximations. *See United States v. Basinger*, 60 F.3d 1400, 1409–10 (9th Cir. 1995) (approximation based on two empty one-pound containers of ephedrine); *Williams*, 989 F.2d at 1073 n. 5 (capacity of glassware and some precursor chemicals); *United States v. Gonzalez–Sanchez*, 953 F.2d 1184, 1187 (9th Cir.1992) (conversion of cash proceeds into equivalent amount of drugs).

■ The appellants' argument is premised on a very narrow definition of "capacity". Appellants essentially argue that the lab's "capacity" is restricted to the capacity of the flask found at the Boyd Street lab; in other words, the amount of methamphetamine which could be manufactured at one time. We reject appellants' constricted reading of application note 12. First, appellants' argument is illogical. Where a defendant manufactures drugs over an extended period of time, the amount of drugs which he could have produced on one occasion does not determine or circumscribe the amount of drugs involved in his total offense. Second, appellants' arguments are not supported by the prior decisions of this Circuit, or of other circuits. Our decisions approving the use of "lab capacity" as an approximation of the relevant amount of drugs make clear that the "capacity" of a drug lab is the amount of drugs which could have been produced *during the course of the offense*. For example, in *United States v. Putney*, 906 F.2d 477 (9th Cir.1990), the defendant admitted that "he had produced about four pounds of methamphetamine *during the period for which he was charged*. The government supplied information to the probation office that the laboratory was capable of producing twelve pounds." *Id.* at 478–79 (emphasis added). We approved the use of the twelve pound "capacity of the laboratory to determine the base offense level." *Id.* at 480. The "capacity" which was relevant in *Putney* was clearly

the lab's capacity "during the period for which [defendant] was charged", not merely the capacity on any given day. *Id.* at 478–79.

Moreover, the Sixth Circuit expressly recognized the need to account for defendants' behavior over time in estimating the relevant quantity of drugs for sentencing purposes in *Walton.* "[F]irst one must determine a weekly quantity and then select a time period over which it is more likely than not that [defendants] were dealing in that quantity." *Walton,* 908 F.2d at 1302. The Third Circuit has also expressly approved the use of a multiplier in approximating the relevant quantity of drugs. In *United States v. Paulino,* 996 F.2d 1541 (3d Cir.1993) (subsequent history omitted), the government presented evidence that on one day $12,000 worth of cocaine, or 12 ounces, was sold at a saloon where cocaine was regularly sold. The district court multiplied that 12 ounces by the number of days over which the conspiracy occurred, and then reduced the result by one-half. The Third Circuit affirmed, finding that "[t]he district court's calculation was squarely based on the quantifiable trial evidence—Novoa's statement concerning the day when sales in the amount of $12,000 were transacted. The halving of this amount, rather than being arbitrary, is, instead a reasonable calculation by the district court, erring on the side of caution, to take into consideration 'off' days and days in which perhaps lesser sales occurred." *Id.* at 1548.

Further, the plain language of application note 12 suggests that lab capacity is merely one of the factors which the district court may consider in approximating the relevant amount of drugs in any given case. There is no suggestion that "capability" is the "endpoint" of the district court's calculations.

Finally, appellants' argument ignores the plain language of Roger Ely's testimony, the basis for the district court's finding, that the flask found at the Boyd Street lab was capable of producing "between 500 and 1,000 grams [of methamphetamine] *per wash.*"

---

\* The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P.

The district court determined that the flask found at the Boyd Street lab was capable of producing between 500—1,000 grams of methamphetamine per reaction and that the evidence clearly demonstrated repeated reactions at the Boyd Street lab. The district court properly took the minimum estimate of 500 grams, and multiplied it by two to reflect the fact that *at least* two reactions occurred. We find no error in the methodology employed by the district court.

AFFIRMED.