**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Brian Matthew SCHEELE, Defendant–Appellant.**

**No. 99–30388.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 2, 2000

Filed Nov. 2, 2000

---

D. Scott Dattan, Anchorage, Alaska, for the defendant-appellant.

Mark A. Rosenbaum, Assistant United States Attorney, Anchorage, Alaska, and Daniel Steven Goodman, U.S. Department of Justice, Washington, D.C., for the plaintiff-appellee.

Before: D.W. NELSON, REINHARDT, and THOMAS, Circuit Judges.

REINHARDT, Circuit Judge:

Appellant Brian Matthew Scheele pleaded guilty to a three count indictment charging him with manufacturing, distributing, and attempting to manufacture methamphetamine. In the plea agreement, the government and Scheele disagreed as to the quantity of drugs attributable to Scheele and as to whether a two-level adjustment for obstruction of justice should apply. After an evidentiary hearing on these issues, the district court sentenced Scheele to 135 months imprisonment. We find that the district court erred in calculating the relevant drug quantity but did not err with respect to the adjustment for obstruction of justice.

## I. BACKGROUND

On March 31, 1998, police responded to a fire in a mobile home and discovered pseudoephedrine tablets and glassware used in the manufacture of methamphetamine. Only residual amounts of methamphetamine were recovered from the remains of the fire. When the police interviewed Blackburn, the owner of the mobile home, he stated that Scheele had been manufacturing methamphetamine in that unit when the fire broke out and described to them Scheele's methamphetamine manufacture and distribution activities.

On April 9, 1998, Blackburn participated in a controlled purchase of an "eight ball" of methamphetamine from Scheele. Blackburn received 1.2 grams of methamphetamine (actual)[1] from Scheele in this

---

**1.** Methamphetamine (actual) refers "to the weight of [only] the controlled substance, itself, contained in the mixture or substance," while methamphetamine (mixture) refers to the entire mixture or substance containing methamphetamine. U.S.S.G. § 2D 1.1(c) at * note (B).

controlled purchase. Scheele was arrested shortly thereafter and advised of his rights. At the time of his arrest, police seized 27.7 grams of methamphetamine (actual) and 21.9 grams of cocaine from Scheele. During the interview following the arrest, Scheele told the agents that he had manufactured about 4–6 ounces of methamphetamine per month for the preceding two years. He also stated that the largest amount of methamphetamine he ever received at one time from McCay, his main source of supply, was 36 ounces, and that he had received 14 ounces from him two months previously. The police released Scheele from custody pending further investigation. On September 9, 1998, Scheele was arrested again. Methamphetamine production equipment and chemicals, including a solution containing 2.6 grams of methamphetamine (actual), were recovered from his truck.

On September 16, 1998, an indictment was issued charging Scheele with manufacturing, distributing, and attempting to manufacture methamphetamine. The three count indictment contained allegations concerning (1) Scheele's manufacture and possession of methamphetamine on the night of the fire in Blackburn's mobile home; (2) Scheele's monitored sale of methamphetamine to Blackburn on April 9, 1998; and (3) Scheele's attempt to manufacture methamphetamine on September 9, 1998, when the production equipment and chemicals were seized from his truck. On August 10, 1999, Scheele agreed to plead guilty to the indictment. The plea agreement noted that the parties disagreed as to the amount of drugs attributable to Scheele and as to whether the defendant should receive a two-level enhancement for obstruction of justice.

The presentence report (PSR) calculated Scheele's base offense level as 34 based on the quantity of drugs involved in the offense. In making this determination, the probation officer considered the amount of methamphetamine seized from Scheele as a result of the offenses to which he pleaded guilty (31.5 total grams of methamphetamine (actual)), the quantity of cocaine seized from Scheele on April 9 (21.9 grams), and the quantities of methamphetamine Scheele had told DEA agents about during his interrogation (146 ounces of methamphetamine (mixture)). The PSR thus attributed 146 ounces of methamphetamine mixture to Scheele in addition to the amount of drugs recovered from him. The 146 ounce figure had three components. First, based on Scheele's statement to DEA agents that he had been manufacturing four to six ounces of methamphetamine per month for the past two years, the PSR attributed 96 ounces of methamphetamine to Scheele (four ounces per month for 24 months). Second, the PSR added 36 ounces of methamphetamine based on Scheele's statement that such was his largest single methamphetamine purchase from McCay. Finally, the PSR added 14 ounces that Scheele claimed to have received from McCay two months earlier. Because Scheele's conduct involved more than one type of drug, the PSR used the drug equivalency tables in the Sentencing Guidelines to convert the drug quantities into marijuana equivalents. See U.S.S.G. § 2D1.1, comment, (n. 10) (drug equivalency tables). The PSR converted Scheele's 31.5 grams of seized methamphetamine (actual) into 315 kg of marijuana, the 21.9 grams of cocaine into 4.38 kg of marijuana, and the 146 ounces of methamphetamine mixture into 8,278 kg of marijuana, arriving at a total of 8,597.38 kg of marijuana. The base offense level for this quantity of marijuana is 34. The PSR recommended no enhancement for obstruction of justice, and agreed with the parties that Scheele was entitled to a three-level reduction in his offense level for acceptance of responsibility. Thus, the PSR calculated Scheele's total offense level as 31.

The government objected to the PSR, arguing that Scheele warranted a two-level increase for obstruction of justice. Scheele objected to the quantity of drugs attributed to him on the basis of his state-

ments made to the DEA agents, arguing that his grandiose statements while under the influence of methamphetamine were not reliable. The district court held an evidentiary hearing on the disputed sentencing issues.

At the hearing, police officer Ronald Sponholz testified that Robert Strahan, a target of the methamphetamine investigation who had agreed to cooperate with law enforcement officers, gave him a microcassette from a telephone answering machine in April, 1998. Sponholz did not produce the tape at the sentencing hearing. According to the officer, when he listened to the tape he recognized Scheele's voice and heard Scheele threaten to harm Strahan for cooperating with the police. He stated that the tape was "very menacing, very profane" and that he heard Scheele call Strahan a "narc" and threaten to "thrash [Strahan] within an inch of [his] life." Strahan's cooperation with the police ceased after the message was left on the answering machine, and Strahan did not testify at the sentencing hearing. The district court found Sponholz credible and found that "there was an attempt at least to threaten or intimidate Mr. Strahan, who might have been a witness against Mr. Scheele because of the dealing that went on between them." The court therefore applied a two-level upward adjustment for obstruction of justice.

At the sentencing hearing, Scheele also disputed the drug quantity attributed to him as part of the conduct relevant to his offense. He testified that he did tell the police that he had purchased 36 ounces of methamphetamine at one time from McCay, but that he made the statement only because the police were pressuring him to cooperate. He maintained that the 36 ounce quantity was actually "red phosphorus," a chemical used in the manufacture of methamphetamine. At the hearing, Scheele also testified that although McKay was supposed to sell Scheele 14 ounces, McKay did not show up as planned and the deal never took place. With re-

spect to the amount of methamphetamine he manufactured, Scheele disavowed his previous statement to police that he had made four to six ounces a month, and testified that he made only one to two, stating "I don't believe I made more than an ounce, maybe two ounces a month." Scheele also testified that he in fact made methamphetamine for only one year—rather than the two years he had previously specified.

In calculating the quantity of drugs attributable to Scheele, the sentencing judge noted that there was no significant disagreement concerning the 31.5 grams of methamphetamine (actual) and 21.9 grams of cocaine recovered from Scheele. This undisputed amount is the equivalent of 319.38 kilograms of marijuana. The district judge then turned to the three disputed amounts that derived from Scheele's statements at the interrogation. He first eliminated the 14-ounce quantity that Scheele had originally stated he purchased from McCay because there was insufficient evidence that Scheele actually received the drugs. The judge similarly disregarded the 36-ounce quantity of methamphetamine because it was not clear whether the shipment contained red phosphorus or methamphetamine.

The district judge then addressed the amount of methamphetamine that Scheele manufactured. Based on Scheele's statements during his interrogation and at the sentencing hearing, he stated, "I think, based on everything I've heard, that he was probably capable of and probably made at least a couple of ounces of methamphetamine a month for two years" and on that basis arrived at an estimate of 48 ounces of methamphetamine (mixture), the equivalent of 2,721 kg of marijuana. The court added to this 2,721 kg the undisputed figure of 319.38 kg seized from Scheele to arrive at a sum of 3,040.98 kg of marijuana. Pursuant to U.S.S.G. § 2D1.1(c)(3), the base offense level for an offense involving between 3,000 and 10,000 kg of marijuana is 34. Adding two levels for obstruc-

tion of justice and subtracting three levels for acceptance of responsibility left Scheele with a total offense level of 33, and a sentencing range of 135–168 months. The district court sentenced Scheele to 135 months imprisonment. Scheele timely filed this appeal.

## II. STANDARD OF REVIEW

■ The district court's interpretation of the Sentencing Guidelines is reviewed de novo. *United States v. Smith,* 175 F.3d 1147, 1148 (9th Cir.1999). The district court's factual findings in the sentencing phase are reviewed for clear error, but must be supported by a preponderance of the evidence. *United States v. Fox,* 189 F.3d 1115, 1118 (9th Cir.1999). "Whether the method adopted by the district court to approximate the relevant quantity of drugs is proper under the guidelines is ... reviewed de novo." *United States v. August,* 86 F.3d 151, 153 (9th Cir.1996).

## III. ESTIMATION OF RELEVANT DRUG QUANTITY

One of the most significant changes effected by the Sentencing Guidelines is the prescription of precisely calibrated punishment for conduct of which the defendant has not been convicted. The Second Circuit recently discussed the new approach to sentencing for unconvicted conduct introduced by the Sentencing Guidelines:

> Endeavoring to strike a balance between punishing only for the offense of conviction and punishing for all wrongful conduct that could be established at a sentencing hearing, the Guidelines opted for incremental punishment for conduct deemed to be "relevant" to the offense of conviction. U.S.S.G. § 1B1.3. As to such "relevant conduct," the Guidelines then took the extraordinary and totally unprecedented step of punishing the relevant conduct at precisely the same degree of severity as if the defendant had been charged with and convicted of the activity constituting the "relevant conduct." No other guideline system in any of the states has instituted such an approach to punishment.

*United States v. Shonubi,* 103 F.3d 1085, 1088 (2d Cir.1997).

■ The Guidelines' approach to punishment for relevant conduct can be illustrated most clearly in the context of narcotics offenses. In imposing a sentence under the Guidelines in a narcotics case, the district court relies chiefly upon the quantity of drugs attributable to the defendant. *See* U.S.S.G. §§ 1B1.3(a)(2); 3D1.2(d). The base offense level is determined by the quantity of drugs involved in the defendant's relevant conduct, which includes not only the drug quantity in the offense of conviction, but all of the additional drugs the sentencing judge finds the defendant distributed or manufactured. *See* U.S.S.G. § 2D1.1(a)(3). Thus, a defendant who pleads guilty or is convicted of distributing the equivalent of 300 kg of marijuana will receive the same base offense level as a defendant who is convicted of distributing the equivalent of 3000 kg of marijuana, if the sentencing judge determines that he also distributed an additional 2,700 kg of marijuana. Recognizing that this practice of assigning sentences based upon unconvicted conduct raises serious due process concerns, the Supreme Court recently held that a judge may not consider sentencing factors that increase the penalty for a crime beyond the prescribed statutory maximum. *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 2362–63, 147 L.Ed.2d 435 (2000). Following *Apprendi,* we held specifically that unconvicted amounts of drugs may not be considered at sentencing where doing so would increase the maximum penalty. *United States v. Nordby,* 225 F.3d 1053 (9th Cir.2000).[2]

---

2. In addition to challenging the sentencing judge's method of estimating the relevant drug quantity, Scheele argues that *Apprendi* renders the judge's finding of drug quantity unconstitutional because it increased the statutory maximum penalty to which Scheele was

A guideline system that prescribes punishment for unconvicted conduct at the same level of severity as convicted conduct obliges courts to proceed carefully in determining whether the relevant conduct has been proven, even in cases in which the issue is only what guideline level or range is applicable. Recently, we emphasized the need for such care when considering the applicable burden of proof. *See United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir.2000). While the Sentencing Commission generally favors the use of the preponderance of the evidence standard in the determination of sentencing factors, U.S.S.G. § 6A1.3, p.s., comment, "[w]e have recognized that the Due Process Clause requires the application of a clear and convincing evidence standard when an enhancement based upon uncharged conduct has an extremely disproportionate effect on the length of a defendant's sentence." *Valensia*, 222 F.3d at 1182.

The need for caution in the determination of sentencing factors is nowhere more evident than in the estimation of drug quantities involved in a defendant's relevant conduct, because the results of any such estimation are necessarily imprecise and slight differences in the amount ultimately assessed can result in the imposition of significantly longer sentences. Still, in calculating the amount of drugs involved in a particular operation, a degree of estimation is often necessary. *See* U.S.S.G. § 2D1.1, comment (n.12) ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."). Accordingly, we have approved various methods of approximation used by district courts to determine drug quantities even

though the sentencing judge will not be able to arrive at the exact amounts involved. *See, e.g., United States v. August*, 86 F.3d 151, 154 (9th Cir.1996) (estimation based on lab capacity); *United States v. Basinger*, 60 F.3d 1400, 1409–10 (9th Cir. 1995) (approximation from two empty ephedrine containers); *United States v. Williams*, 989 F.2d 1061, 1073 (9th Cir. 1993) (capacity of glassware and precursor chemicals); *see also United States v. Paulino*, 996 F.2d 1541, 1548 (3d Cir.1993), *cited with approval in August*, 86 F.3d at 154 (testimony of drug sales of one evening multiplied by the number of days over which the conspiracy occurred, and divided in half to account for "off days").

Recognizing that approximations of drug quantities are by their nature imprecise, we have held that a sentencing judge must err on the side of caution:

> [S]ince a defendant's sentence depends in large part upon the amount of drugs attributable to his conduct, and approximation is by definition imprecise, the district court must err on the side of caution in choosing between two equally plausible estimates.

*United States v. August*, 86 F.3d 151, 154 (9th Cir.1996). This principle applies whenever a court is estimating drug quantities, not just when choosing between two equally plausible estimates. Here, the district court made every effort to be fair and even-handed in determining what amounts of narcotics to include in the estimation. Nevertheless, in arriving at the final quantity of drugs attributable to Scheele for purposes of sentencing, the district court failed to err on the side of caution. The district court found that Scheele's relevant

exposed. We need not address the application of *Apprendi* in this case, because Scheele was not prejudiced by any error under *Apprendi*. Scheele was sentenced to 135 months, less than the lowest possible statutory maximum applicable for manufacture of methamphetamine: the twenty-year maximum under 21 U.S.C. § 841(b)(1)(C) for distribution of an unspecified quantity of meth-

amphetamine. Thus, even if the district court's finding of drug quantity increased the prescribed maximum to which Scheele was exposed, Scheele was not, for purposes of *Apprendi*, prejudiced by the error because the sentence he received fell well below the statutory maximum for the offense to which he pleaded guilty. *See United States v. Garcia-Guizar*, 227 F.3d 1125 (9th Cir.2000).

conduct involved the equivalent of 3,040.98 kg of marijuana, just 40 kilograms, or slightly over one percent, above the minimum amount for a base offense level of 34. U.S.S.G. § 2D1.1(c)(3).

Of the 3,040.98 kg total attributed to Scheele, 2,721 kg was derived from the sentencing judge's estimate that Scheele had cooked two ounces of methamphetamine a month for two years. The judge's approximation of the amount of methamphetamine that Scheele manufactured was based on the defendant's statement during his interrogation that he cooked four to six ounces of methamphetamine per month for two years, and on his testimony at the sentencing hearing that he made "an ounce, maybe two ounces" a month for one year. The judge split the difference and opted for two ounces a month for two years. We acknowledge his right to apply this general approach. However, the drug quantity attributed to Scheele was a rough approximation at best. Even assuming the general correctness of the monthly amount and the period of time determined by the district judge, in any given month Scheele may, in fact, have cooked somewhat more or somewhat less than the two ounces estimated by the judge, and his manufacturing operation may have lasted for a somewhat longer or shorter time than the 24 months chosen by the district judge.

The district judge recognized that he was making an estimate that was not precise, and indeed he had no alternative to doing so. In this case, however, the imprecise estimate resulted in the judge's arriving at a quantity that was barely above the amount that would have led to a significantly lower sentencing range. If Scheele manufactured a total of 47 rather than the estimated 48 ounces over the two year period, or only one ounce less in any single month of that 24 month period, or if Scheele's conduct occurred over 23 and one-half months rather than the estimated 24 month period, the total quantity of drugs (as converted) would have been below 3,000 kg; in such case, Scheele would have received a base offense level of 32 instead of 34, and would have been subjected to a sentencing range that was significantly lower.[3] The margin of error that separated the determination to apply the higher and not the lower sentencing range to Scheele was approximately one percent, with a resulting difference in his sentence that could well be more than two years.

Where, as here, a drug quantity is arrived at in a manner that is inherently imprecise, the district court must consider the margin of error before finally fixing the amount attributable to the defendant. If taking the margin of error into account and erring on the side of caution would reduce the defendant's base offense level to the next lowest level, the court must do so. *See August*, 86 F.3d at 154; *cf. Paulino*, 996 F.2d at 1549 (upholding the district court's approximation in part because the calculation would have to be off by more than 50% to change the defendants' offense level). Here, if the district court had considered the margin of error and applied the principle that one must err on the side of caution in estimating drug quantities, Scheele would have received a lower base offense level, and, as we have explained, might well have received a significantly lower sentence.[4] The error here involved

---

3. One ounce of methamphetamine mixture equals 28.35 grams. Under the drug equivalency table, one gram of methamphetamine mixture is the equivalent of 2 kg of marijuana. § 2D1.1, comment (n. 10). Therefore, one ounce of methamphetamine mixture is the equivalent of 56.7 kg of marijuana.

4. The district judge sentenced Scheele to 135 months, the lowest possible sentence within the prescribed range of 135–168 months. If Scheele's base offense level had been calculated at 32, the applicable sentencing range would have been 108–135 months. Although Scheele could have received the same 135 month sentence under the proper offense level calculation if the court had wished to impose the highest possible sentence in the applicable range, nothing in the record suggests that the sentencing judge would have done so.

a failure to follow a governing legal principle, rather than an exercise of the district court's broad discretion. We conclude, therefore, that the district court's failure to consider the margin of error when arriving at the quantity of drugs on which the sentence was based constitutes error and requires vacation of the sentence.

## IV. ADJUSTMENT FOR OBSTRUCTION OF JUSTICE

Scheele also challenges the two-level enhancement for obstruction of justice. He argues that, without the tape of Scheele allegedly threatening Strahan, Officer Sponholz's testimony was insufficiently reliable to be considered at sentencing, and, in the alternative, that the statements Scheele allegedly made on the tape do not rise to the level of obstruction of justice. We hold that the district court did not err in applying an obstruction of justice adjustment.

■ Scheele argues that reliance on the officer's testimony about the tape recording rather than the recording itself is objectionable. Under the Sentencing Guidelines, "[t]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability." U.S.S.G. § 6A1.3, p.s. Sponholz's statements regarding what he heard Scheele say on the tape is not hearsay evidence because the testimony was not offered to prove the truth of the matter asserted in the tape but merely to prove that Scheele made the threatening statements.[5] Nothing in the record suggests that Sponholz's

testimony was unreliable, and Scheele had an opportunity to cross-examine Sponholz as to what he heard on the tape. The district court therefore did not err in considering Sponholz's testimony at sentencing.

■ Scheele also argues that even if Sponholz's testimony is accepted as true, there was insufficient evidence for the district court to find that Scheele obstructed justice. Under the Guidelines, a two-level increase for obstruction of justice applies "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense...." U.S.S.G. § 3C1.1. The enhancement encompasses "threatening, intimidating, or otherwise unlawfully influencing a ... witness ... or attempting to do so." U.S.S.G. § 3C1.1 comment (n.3). Scheele testified that he had supplied Strahan with methamphetamine, and that he learned that Strahan had been arrested soon afterward. The officer testified that on the tape, Scheele called Strahan a "narc," and that it was clear that he was aware that Strahan had had contact with the police. According to Sponholz, Scheele indicated on the tape that he knew Strahan was cooperating because the police permitted him to remove his car from his employer's parking lot when he was arrested. He also testified that the tape was "very menacing, it was very profane, very foul language, cursing, threatening to—and I believe the words were 'thrash you within an inch of your life.'" The district judge made a factual finding that Scheele attempted to threat-

---

To the contrary, the fact that the judge assigned the lowest possible sentence available under the calculations he made suggests the opposite. The error in the calculation of Scheele's base offense level was therefore not harmless.

5. Although hearsay statements may be used at sentencing, see, e.g., *United States v. Alonso*, 48 F.3d 1536, 1546 (9th Cir.1995), a district

court must carefully scrutinize hearsay evidence to ensure that it has sufficient indicia of reliability. See *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir.1995) (finding the hearsay statement of an accomplice unreliable where it was made in the context of plea negotiations and the government presented no extrinsic evidence to corroborate the statement).

en or intimidate Strahan because he might have cooperated with police. He did not err in finding that the statements made by Scheele constitute obstruction of justice. *See United States v. Jackson,* 974 F.2d 104, 106 (9th Cir.1992) (finding that a defendant has obstructed justice "[w]here a defendant's statement can be reasonably construed as a threat.").

## V. CONCLUSION

We VACATE Scheele's sentence and REMAND to the district court for the sole purpose of resentencing him on the basis of a base offense level of 32 and an adjusted offense level of 31 instead of on the basis of the levels employed at the time of his initial sentencing.

VACATED AND REMANDED.