# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

MARK STEPHEN FORRESTER,
              *Defendant-Appellant.*

No. 09-50029

D.C. No.
3:01-cr-03177-W-2

ORDER AND
OPINION

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

Argued and Submitted
November 3, 2009—Pasadena, California

Filed July 30, 2010

Before: Cynthia Holcomb Hall, Thomas G. Nelson and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence and Partial Dissent by Judge Hall

10913

**COUNSEL**

Benjamin L. Coleman and Ethan A. Balogh, Coleman & Balogh, LLP, Attorneys for defendant-appellant Mark Stephen Forrester.

Karen P. Hewitt, Bruce R. Castetter, Todd W. Robinson, and Stewart M. Young, Attorneys for plaintiff-appellee United States of America.

---

## ORDER

The opinion filed on January 5, 2010, and published at 592 F. 3d 972 (9th Cir. 2010), is hereby withdrawn, and a new opinion and partial dissent are filed concurrently herewith. Appellant's petition for panel rehearing and rehearing en banc, filed January 15, 2010, is hereby rendered moot. The parties are permitted to file new petitions for rehearing pursuant to Federal Rule of Appellate Procedure 40.

---

## OPINION

M. SMITH, Circuit Judge:

Defendant-Appellant Mark Stephen Forrester (Forrester) appeals his conviction and sentence for conspiracy to manufacture and distribute ecstasy in violation of 21 U.S.C. §§ 846 and 841(a)(1). Forrester and his codefendants operated a large ecstasy laboratory that was under surveillance for over a year before being closed by law enforcement authorities. Forrester represented himself at trial, and was convicted and sentenced to 30 years in prison. We previously remanded Forrester's case based on our finding that Forrester unintelligently waived his right to counsel. On remand, Forrester pleaded guilty, and was again sentenced to 30 years. He raises five issues on appeal. First, he claims that the district court erred by failing to allow him to argue that ecstasy should be categorized as a Schedule III, rather than a Schedule I, controlled substance, and that 21 U.S.C. § 841(b) is unconstitutional. Second, he asserts that he has a present right to accept the government's original plea offer—which he originally

rejected—because he had been misadvised by the district court concerning his maximum sentence exposure. Third, Forrester alleges that his conspiracy indictment was unconstitutionally vague. Fourth, he argues that the district court erred in denying his motion to suppress all fruits of the wiretap. Finally, he claims that the district court erred in sentencing him to 30 years in prison.

We affirm Forrester's conviction, but vacate his sentence, and remand for resentencing.

## FACTS, PRIOR PROCEEDINGS, AND JURISDICTION

Law enforcement authorities conducted a lengthy investigation into an elaborate conspiracy to manufacture ecstasy. Investigators tracked the conspiracy for over a year using an array of surveillance techniques. They traced chemical purchases, used confidential informants to infiltrate the operation, followed Forrester to Stockholm where he met with chemists, and discovered a clandestine laboratory in Escondido, California. Agents raided the lab and seized large volumes of ecstasy and precursor chemicals.

In October 2001, Forrester and his codefendants were charged with conspiracy to manufacture and distribute ecstasy. On October 23, 2002, the district court held a *Faretta* hearing to determine whether Forrester was competent to represent himself. The judge found that he was but, during the hearing, the district judge misinformed Forrester that he was facing a sentence of 10-years-to-life, when he was actually facing a sentence of 0-to-20 years. Forrester represented himself from that point in the proceedings until his initial appeal.

On July 3, 2003, the government approached Forrester and his codefendant Dennis Alba (Alba) with a deal. They informed Forrester and Alba that if they did not both plead guilty that same day, the government would file an enhance-

ment pursuant to 21 U.S.C. § 851 requesting that Forrester's maximum sentence be increased from 20 to 30 years. Forrester and Alba both declined the offer and, on July 18, 2003, a jury found Forrester guilty. He was sentenced to 30 years on May 26, 2003. Forrester appealed on May 31, 2003. We found that Forrester had unknowingly and unintelligently waived his right to counsel because the district judge misinformed him regarding his maximum sentence, *United States v. Forrester*, 512 F.3d 500, 506-09 (9th Cir. 2008) (*Forrester I*), and remanded the case to the district court. On remand, Forrester entered a conditional guilty plea, and was sentenced again to 30 years. He now appeals for the second time.

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STANDARDS OF REVIEW

In addressing Forrester's first claim regarding the classification of ecstasy as a Schedule I substance, we review de novo the district court's construction or interpretation of a statute. *See Beeman v. TDI Managed Care Servs., Inc.*, 449 F.3d 1035, 1038 (9th Cir. 2006). The district court's decision to preclude a defendant's proffered defense is also reviewed de novo. *See United States v. Batterjee*, 361 F.3d 1210, 1216 (9th Cir. 2004).

Forrester next argues that his failure to accept the plea offer was involuntary. The voluntariness of a guilty plea is subject to de novo review. *See United States v. Gaither*, 245 F.3d 1064, 1068 (9th Cir. 2001).

Forrester also contests the sufficiency of the conspiracy indictment, which we review de novo. *United States v. Berger*, 473 F.3d 1080, 1097 (9th Cir. 2007).

We next address a number of issues with regard to the wiretap application. We review de novo the district court's

interpretation of the wiretap statute. *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006). A bifurcated standard of review applies to wiretap necessity findings. First, we review de novo whether a wiretap application is supported by a full and complete statement of the facts in compliance with 18 U.S.C. § 2518(1)(c). *United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008). If a wiretap is adequately supported, then we review the district court's necessity finding for abuse of discretion. *United States v. Lynch*, 437 F.3d 902, 912 (9th Cir. 2006).

Finally, Forrester raises three sentencing issues. We review ex post facto challenges to sentencing decisions de novo. *United States v. Ortland*, 109 F.3d 539, 543 (9th Cir. 1997). Similarly, we review de novo whether the district court failed to make sufficient findings. *United States v. Carter*, 219 F.3d 863, 866 (9th Cir. 2000). Whether the method used by the district court to approximate the quantity of drugs was proper under the United States Sentencing Commission Guidelines Manual (Guidelines) is reviewed de novo, and factual findings related to the capability of a drug operation are reviewed for clear error. *United States v. Chase*, 499 F.3d 1061, 1068 (9th Cir. 2007).

## DISCUSSION

Forrester appeals his conviction and sentence. First, he argues that ecstasy should be classified as a Schedule III substance, and that his maximum sentence must be determined by a jury. Second, he asserts that misinformation regarding his maximum sentence rendered his rejection of a plea deal unintelligent. Third, he claims that his conspiracy indictment was unconstitutionally vague. Fourth, he alleges that the district court erred in denying his motion to suppress all fruits of the wiretap. Finally, he claims that his sentence was improper.

## I. Controlled Substance Scheduling

**[1]** The Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, establishes five categories or "schedules" of controlled substances. Ecstasy has been classified as a Schedule I controlled substance since March 23, 1988. *See* 53 Fed. Reg. 5156 (Final Rule dated Feb. 22, 1988—Schedules of Controlled Substances; Scheduling of 3,4 Methylenedioxymethamphetamine (MDMA) into Schedule I of the Controlled Substances Act; Remand). Violations involving Schedule I substances carry more severe penalties than those in Schedule III because the drugs have a high potential for abuse and no generally accepted medical benefits.[1] 21 U.S.C. § 812(b)(1). Forrester claims that the district court erred by failing to allow him to present a defense that ecstasy should be categorized as Schedule III rather than as Schedule I, which defense, had it been allowed, would have subjected him to a lower maximum penalty, as set forth in 21 U.S.C. § 841(b)(1)(D). Alternatively, he argues that § 841(b) violates the Fifth and Sixth Amendments because it allows a maximum sentence to be determined by a fact not found by the jury.

### A. Collateral Attack on a Scheduling Order

**[2]** The Attorney General (AG) has designated ecstasy as a Schedule I controlled substance under the CSA.[2] The CSA allows the AG to schedule a substance on a temporary basis

---

[1]The maximum Schedule I and III sentences for offenses committed by a defendant with a prior drug conviction are 30 years and 10 years, respectively. *See* §§ 841(b)(1)(C), (D).

[2]Congress delegated the authority to schedule drugs to the AG, 21 U.S.C. § 811(h) and the AG, in turn, has delegated the authority to update the CSA schedules to the Drug Enforcement Agency (DEA). 28 C.F.R. § 0.100. However, the legitimacy of this delegation is not at issue here; accordingly, for purposes of this opinion, we attribute scheduling decisions to the AG.

when doing so is "necessary to avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h).[3]

**[3]** Forrester argues that the Schedule III definition more accurately describes ecstasy than does the one in Schedule I, and that "the scheduling of ecstasy has been questioned by the medical community." Forrester further argues that denying him the opportunity to argue that ecstasy should be designated a Schedule III controlled substance violates *Touby v. United States*, 500 U.S. 160 (1991). Specifically, Forrester believes that he has a right to collaterally attack the substance of the scheduling order because Congress has not explicitly foreclosed such review. This is an issue of first impression in this circuit.

In *Touby*, the petitioners were convicted of conspiring to manufacture "Euphoria," a designer drug that was temporarily placed under Schedule I. 500 U.S. at 162. The primary question in *Touby* was whether the AG's power to temporarily schedule a substance violated the non-delegation doctrine. *Id.* at 164-67. The Court also considered whether the temporary scheduling statute was unconstitutional because it bars judicial review. *Id.* at 168-69. The Court held that (1) direct, pre-enforcement review of a *permanent* scheduling order is plainly authorized by 21 U.S.C. § 877 and that petitioners wishing to challenge the order can do so when the temporary order becomes permanent, (2) the AG's compliance with his delegated duties may always be challenged by individuals facing criminal charges, whether they are temporary or permanent, and (3) substantive, collateral attacks on *temporary* scheduling orders may be brought by criminal defendants whose sentences will be affected by the order. *Id.* at 160.

---

[3]This allows the AG to bypass, for a limited time, the lengthy procedure required for permanent scheduling and thus enables the government to respond more quickly to dangerous new drugs. Temporary scheduling orders remain valid for one year. Section 811(h)(6) provides that a temporary order is not subject to "judicial review." *Id.*

The concurring opinion in *Touby* emphasized that "the opportunity of a defendant to challenge the substance of a temporary scheduling order in the course of a criminal prosecution is essential to the result in this case" and that Congress "did not intend to foreclose review in the enforcement context." *Id*. at 169-70. The concurring minority was concerned that temporary scheduling orders, which have not been fully vetted by the AG or passed all of the necessary procedural requirements, were going to have a severe impact on criminal defendants who were sentenced pursuant to the orders. In effect, the opinion permitted a concurrent vetting by the courts to ensure that such temporary orders were not improper. We construe *Touby*'s holding to be limited to *temporary* orders because *permanent* orders are thoroughly vetted and allow for direct attacks through 21 U.S.C. § 877.

The Eleventh Circuit, the only circuit to have previously addressed this issue to date, came to the same conclusion. *United States v. Carlson*, 87 F.3d 440 (11th Cir. 1996). Carlson, like Forrester, attempted to substantively challenge the AG's ruling that ecstasy is a Schedule I controlled substance. *Id*. at 446. The Eleventh Circuit held that a defendant cannot "make a collateral attack on a final regulatory decision in a criminal case." *Id*. It gave two reasons: "[f]irst, the decision to schedule a substance like [ecstasy] is a complex matter, . . . [and] [s]econd, and more importantly, the agency itself is not a party in the case; hence it has no opportunity to defend its scheduling order." *Id*. Additionally, to allow all criminal defendants to collaterally attack a permanent scheduling order based on their view that a particular drug has been misscheduled would potentially place a continuing, onerous burden on district courts to constantly re-litigate the same issue.

**[4]** Forrester argues that, in other situations, Congress has been explicit about not permitting collateral attacks at trial. For example, 8 U.S.C. § 1189(a)(8) states:

> If a designation under this subsection has become effective under paragraph (2)(B) a defendant in a

criminal action or an alien in a removal proceeding shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing.

Section 1326(d) contains a similar provision in the deportation context. However, the evidence that Congress has, at times, taken a more proactive stance toward controlling collateral challenges is not sufficient to overcome our reading of *Touby*, and the persuasive reasoning of our sister circuit, to the effect that collateral attacks are not permitted in criminal cases involving *permanent* scheduling orders.

**[5]** We hold that substantive collateral attacks on permanent scheduling orders are impermissible in criminal cases where defendants' sentences will be determined by those scheduling orders. Accordingly, we conclude that the district court did not err in denying Forrester's motion for an evidentiary hearing on the issue.

## B.   Constitutionality of 21 U.S.C. § 841(b)

Forrester also argues that 21 U.S.C. § 841(b)(1)(C) violates the Fifth and Sixth Amendments, as construed in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002), because it allows his maximum sentence to be determined by a fact not found by the jury beyond a reasonable doubt.

**[6]** The Supreme Court held in *Apprendi* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Buckland*, the government conceded that the district court had violated *Apprendi* when it, rather than the jury, determined the quantity of drugs attributable to the defendant. *Buckland*, 289 F.3d at 568. Forrester contends that the question of whether ecstasy meets the defi-

nition of a Schedule I substance is a factual determination that must be left to the jury.

**[7]** In both *Apprendi* and *Buckland*, the judges made improper findings of *conduct* (sale of a particular drug and engaging in hate speech, respectively) by a preponderance of the evidence. The respective courts held that those findings should have been made by a jury beyond a reasonable doubt. *See Buckland*, 289 F.3d at 563; *Apprendi*, 530 U.S. at 471. However, both cases explicitly confirm Congress's ability to "ramp up the punishment for controlled substance offenders based on the type and amount of illegal substance involved in the crime." *Buckland*, 289 F.3d at 568; *see also Apprendi*, 530 U.S. at 495 (recognizing Congress's ability to choose "[t]he degree of culpability . . . associate[d] with particular, factually distinct conduct"). Therefore, under *Buckland* and *Apprendi*, the relevant fact questions for the jury in this case would have been what conduct Forrester engaged in (conspiracy to manufacture and distribute drugs) and what type of drug was involved in the conspiracy (ecstasy). Here, those are issues of fact that would have been found by a jury had Forrester gone to trial, instead of pleading guilty.[4] In contrast, the question of whether ecstasy is a drug that warrants greater restrictions and punishment because of its highly undesirable qualities is one that has been properly delegated to the legislative branch. In other words, it is within the realm of Congress's power to "ramp up the punishment" for ecstasy. *Buckland*, 289 F.3d at 568. The AG, with the power delegated by Congress,[5] chose to do so by categorizing it as Schedule I rather than as Schedule III. In the same way that elements of a crime are determined by Congress, so are the classifications of certain illegal

---

[4]Forrester pleaded guilty and thus waived his right to a jury trial. His guilty plea thus stands in the place of a jury's findings. *See United States v. Banuelos*, 322 F.3d 700, 709 n.3 (9th Cir. 2003) (Tallman, J., dissenting in part) (citing *United States v. Sanchez*, 269 F.3d 1250, 1272 n.2 (11th Cir. 2001)).

[5]*See supra* note 2.

drugs. Determining which offenses are worthy of greater punishments is a legislative prerogative. This policy judgment cannot properly be construed as a "fact that increases the penalty for a crime" within the meaning of *Apprendi*. 530 U.S. at 490.

## II.   Rejected Plea Offer

On October 23, 2002, Forrester waived his right to counsel under *Faretta v. California*, 422 U.S. 806 (1975) (the *Faretta* hearing). However, during the *Faretta* hearing colloquy, the district court incorrectly advised Forrester that he faced 10 years-to-life in prison, whereas he actually faced zero-to-20 years in prison. *Forrester I*, 512 F.3d at 507. The government did not correct the court's erroneous advice.

On July 3, 2003 (five days before trial), the government extended a plea offer to Forrester and Alba. The government told Forrester that if both he and Alba accepted the "package deal," Forrester could limit his exposure to 20 years. The government stated that if the plea offer was not accepted by 2:00 pm that same day, it would file a sentence enhancement pursuant to 21 U.S.C. § 851. The offer was not accepted by either Forrester or Alba, and the government filed the § 851 enhancement, thereby enhancing Forrester's maximum penalty from 20 to 30 years. *See* 21 U.S.C. § 841(b)(1)(C).

The case proceeded to trial and Forrester was convicted, and sentenced to the maximum of 30 years. We reversed, finding a defective waiver of counsel due to the district court's erroneous sentencing advisement during the *Faretta* hearing. *Forrester I*, 512 F.3d at 505-09. Following remand, Forrester filed a motion requesting that the district court strike the § 851 enhancement and allow him to plead guilty without the enhancement because he had been misadvised of the potential penalties at the *Faretta* hearing. The district court denied the motion, stating:

Well, the government has the right to file anything they think, any conduct or convictions they think they can prove. With regard to misadvising him of the maximum penalty, you are absolutely correct I did misadvise him. No question about that.

. . .

In any event, I don't think there is anything inappropriate for the government having filed that 851 allegation. I understand your honor [sic] position, but your request that I have it stricken or dismissed is denied.

Forrester then pleaded guilty and was sentenced (again) to the 30-year maximum. Forrester alleges that the district court erred by failing to dismiss the § 851 sentence enhancement due to its prior sentencing miscalculation, thereby depriving him of the opportunity to make a knowing and intelligent decision to accept an earlier plea offer that did not include the enhancement.

[8] Federal Rule of Criminal Procedure 11(b) states that the court must hold a hearing and inform a defendant of, and determine that he understands, "any maximum possible penalty, including imprisonment, fine, and term of supervised release" and "any mandatory minimum penalty," before it accepts his guilty plea (the plea hearing). FED. R. CRIM. P. 11(b)(1)(H) & (I). A failure to ensure that a defendant understands his range of exposure may violate the requirement that a guilty plea be "knowing and voluntary." *See, e.g.*, *Tanner v. McDaniel*, 493 F.3d 1135, 1146 (9th Cir. 2007) (holding that guilty plea is voluntary and knowing only if defendant understands the range of allowable punishment that will result from his plea). Forrester's case differs from the standard situation where pleas are found involuntary due to misinformation about the potential sentence in two ways: (1) Forrester *rejected* the plea offered to him, and (2) the court misin-

formed him of his exposure during a *Faretta* hearing rather than during a plea hearing.

**[9]** "[T]here is no constitutional right to plea bargain." *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977). Nonetheless, defendants who plead guilty are given the protection of the "voluntary and intelligent" requirement because, in pleading guilty, they are relinquishing fundamental constitutional rights. *See* FED. R. CRIM. P. 11(b) (detailing defendant's right to plead not guilty, to a jury trial, to have counsel, to confront witnesses, and to present evidence). However, the voluntary and intelligent requirement has never been extended to *rejections* of plea offers. When a defendant turns down a guilty plea, he is giving up only the opportunity to limit his exposure to the terms of that plea.

Forrester argues that, once a plea offer has been made, a defendant has a right to be accurately informed about his potential exposure before deciding to reject it. He relies on *Nunes v. Mueller*, a habeas case in which an attorney misinformed the defendant that he had received a plea offer for 22 years as opposed to 11 years. 350 F.3d 1045 (9th Cir. 2003). In *Nunes*, we suggested that the right to make an informed decision about a plea is a corollary to the right to voluntarily and intelligently plead guilty. *Id.* at 1053 ("The right that Nunes claims he lost was not the right to a fair trial or the right to a plea bargain, but the right to participate in the decision as to, and to decide, his own fate—a right also clearly found in Supreme Court law."). In that case, we ordered the reinstatement of Nunes' original plea offer, rather than the more common remedy of a new trial, in order to "put the defendant back in the position he would have been in if the Sixth Amendment violation never occurred." *Id.* at 1057 (internal quotation marks omitted).

**[10]** *Nunes* was based on the well-founded constitutional right to effective assistance of counsel. *Id.* at 1051-1054. For *Nunes* to apply here, we would have to find that Forrester suf-

fered a similar unconstitutional deprivation of rights that tainted his rejection of the plea offer. We decline to do so on these facts. Though a defendant may have a right to voluntarily and intelligently reject a plea offer, we need not reach that question in this case because any error was harmless. *See Bains v. Cambra*, 204 F.3d 964, 971 n.3 (9th Cir. 2000) (reciting *Chapman* "harmless beyond a reasonable doubt" standard for constitutional trial type errors).

First, Forrester was offered a "package deal" with Alba. Because Alba rejected the deal, Forrester could not unilaterally have accepted it even if he had been aware of his actual potential sentence. Indeed, Alba had no incentive to accept the plea, as the threatened enhancement did not affect his exposure because he already faced life in prison on a continuing criminal enterprise count.

**[11]** Second, Forrester's maximum and minimum possible sentences were *overstated*. Forrester was offered a 20-year cap on his sentence when he thought he faced 10-to-life if he went to trial. In rejecting the offer to cap his exposure at 20 years, he risked receiving what he thought was a life sentence for the potential benefit of being acquitted. He now claims that, had he known that he actually faced a potential sentence of 0-to-30 years (with the enhancement), he would have foregone risking the 30-year maximum and accepted the deal to cap his exposure at 20 years. In other words, he says he was willing to risk receiving 10-to-life for the possibility of acquittal, but would not have been willing to take his chances at 0-to-30. We find this argument counterintuitive. Though it is certainly possible that a misinformed defendant may reject a plea that he otherwise would have taken, that was undoubtedly not the case here. *Cf. United States v. Stubbs*, 279 F.3d 402, 411 (6th Cir. 2002) ("When the maximum possible sentence is overstated, the defendant might well be influenced to *accept* a plea agreement he would otherwise reject." (emphasis added) (internal quotation marks omitted)).[6] Therefore, the

---

[6]In *Forrester I*, we rejected a similar argument that the district court's overstatement made Forrester less likely to waive counsel. 512 F.3d at

district court's denial of the motion to strike the enhancement was proper.

## III. Sufficiency of the conspiracy indictment

Forrester alleges that his indictment for conspiracy was insufficient. The second superseding indictment at issue reads:

> Beginning at a date unknown to the grand jury and continuing up to and including October 18, 2001, within the Southern District of California, and elsewhere, [Forrester and 18 other named defendants], all charged elsewhere, did knowingly and intentionally conspire together and with each other and with other persons known and unknown to the grand jury to manufacture and distribute a controlled substance, to wit, 3,4 Methylenedioxyamphetamine ("MDA"), commonly known as "ecstasy", a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

Forrester filed a motion to dismiss for deficiency, and the district court denied the motion without explanation.

**[12]** An indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). "An indictment is sufficient if it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against him which he must defend and (2) enables him to plead an acquittal or con-

507-08. We emphasized in that context, however, that harmless error review does not apply to *Faretta* waivers. *Id.* at 508. By contrast, errors relating to plea hearings are subject to harmless error review. *See United States v. Minore*, 292 F.3d 1109, 1120 (9th Cir. 2002), *cert. denied*, 537 U.S. 1146 (2003).

viction in bar of future prosecutions for the same offense." *United States v. Lazarenko*, 564 F.3d 1026, 1033 (9th Cir. 2009) (internal quotation marks omitted). "Generally, an indictment is sufficient if it sets forth the elements of the charged offense so as to ensure the right of the defendant not to be placed in double jeopardy and to be informed of the offense charged." *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004) (internal quotation marks omitted). With respect to conspiracies, "[a]n indictment under 21 U.S.C. § 846 . . . is sufficient if it alleges: a conspiracy to distribute drugs, the time during which the conspiracy was operative and the statute allegedly violated, even if it fails to allege or prove any specific overt act in furtherance of the conspiracy." *United States v. Tavelman*, 650 F.2d 1133, 1137 (9th Cir. 1981) (internal quotation marks omitted).

**[13]** Forrester contends that the indictment is insufficient because it fails to specify a beginning date for the conspiracy, thereby possibly subjecting him to double jeopardy. However, although an indictment cannot be completely open-ended, *see United States v. Cecil*, 608 F.2d 1294, 1296-97 (9th Cir. 1979), an indictment that specifies an end date is sufficient to apprise defendants of the charges and enable them to prepare a defense, *see United States v. Rohrer*, 708 F.2d 429, 435 n.7 (9th Cir. 1983) (holding that an indictment alleging that the conspiracy extended until "at least" 1980 was sufficient).

**[14]** In addition, uncertainty regarding a conspiracy's beginning and ending dates does not render an indictment fatally defective so long as overt acts alleged in the indictment adequately limit the time frame of the conspiracy. *United States. v. Laykin*, 886 F.2d 1534, 1542 (9th Cir. 1989) (18 specific facts alleged in the indictment were sufficient to limit the time frame). Here, the second superceding indictment tracks the language of the conspiracy statute, identifies a location and co-conspirators, and alleges the purpose of the conspiracy. It also alleged a semi-discrete time period (it gave an end date but no beginning date) and certain overt acts. Taken

together, the indictment was sufficient to apprise Forrester of the charges against him, enable him to prepare a defense, and to avoid double jeopardy on the same charge. We thus conclude that the district court did not err in denying Forrester's motion to dismiss the indictment.

## IV.   The Wiretap

On February 5, 2001, the government submitted an initial application for a 30-day wiretap order. The application contained a 53-page affidavit by Special Agent Robert Aguirre, and a separate 3-page affidavit (Exhibit C) that was filed under seal. The district judge approved the wiretap on the same day. Forrester challenges the wiretap on several grounds. First, he claims that he was entitled to access the redacted contents of Exhibit C. Second, he claims that the wiretap application failed to comply with the "necessity" requirement of the statute. Third, he claims that the wiretap violated the Fourth Amendment.

### A.   Right to View the Redacted Affidavit

Exhibit C provided information about a confidential informant referred to as "CS." Federal Rule of Criminal Procedure 16 governs government disclosure of information, stating:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> > (i) the item is material to preparing the defense;
> >
> > (ii) the government intends to use the item in its case-in-chief at trial; or

> (iii) the item was obtained from or belongs
> to the defendant.

FED. R. CRIM. P. 16(a)(1)(E). In addition, 18 U.S.C. § 2518 states that the fruits of a wiretap may not be used in court unless a copy of the court order and the wiretap application are furnished to each party:

> The contents of any wire, oral, or electronic communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding . . . unless each party . . . has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved.

*Id.* § 2518(9).

**[15]** The district court denied Forrester's motion for specific discovery of Exhibit C. It found that the items sought were not discoverable under Rule 16 because they were not material to the presentation of the defense. The question is whether 18 U.S.C. § 2518, which mandates disclosure of the wiretap application, allows the government to redact some information in the application. This is a question of first impression in our circuit, though one that has been addressed by other courts.

Forrester asks us to adopt the reasoning of the district court in *United States v. Arreguin*, 277 F. Supp. 2d 1057 (E.D. Cal. 2003). That court held that, pursuant to 18 U.S.C. § 2518(9), a defendant has a right to all wiretap application materials, including unredacted copies of affidavits in support of the application. It reasoned that 18 U.S.C. § 2518 "was enacted to provide greater [privacy] protection than that mandated by the Constitution under then-existing precedent," *id.* at 1060 (citing *Gelbard v. United States*, 408 U.S. 41, 48 n.7 (1972)),

and noted that "[t]he statutory requirements for wiretap authorization are far more burdensome than those mandated by the Constitution," *id*. at 1060-61. Similarly, the court noted that 18 U.S.C. § 2518(8)(b) provides that wiretap applications can not be unsealed absent a showing of good cause and gives judges discretion in determining what to disclose. *Id*. at 1061. Section 2518(9), on the other hand, *requires* that each party receive a copy of the wiretap application before evidence may be received—it does not include any of the discretionary language found in § 2518(8)(b). *Id.* The district court considered this to be "a judgment by Congress that the good cause requirement is satisfied where the government plans to use evidence derived from a wiretap." *Id.* at 1061-62. Under that reasoning, the court required the government to disclose wiretap applications in their entirety before using the evidence derived from the wiretaps. *Id*. at 1062-63; *see also United States v. Manuszak*, 438 F. Supp. 613, 619, 625 (E.D. Pa. 1977) ("Unlike Section 2518(8)(d) . . . which gives the court discretion to deny access to the order and application, Section 2518(9) mandates that these items be made available to a party facing any proceeding[.]" (internal quotation marks omitted)).

**[16]** We find the reasoning in *United States v. Danovaro* more persuasive. 877 F.2d 583 (7th Cir. 1989). In that case, the Seventh Circuit held that a defendant does not have a right to redacted portions of a wiretap application if the government is able (and willing) to defend the warrant without relying on the redacted information. *Id*. at 588. The court determined that such a rule was consistent with 18 U.S.C. § 2518(9) because "[s]tatutes requiring disclosure, but silent on the question of privilege, do not override customary privileges." *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 397-98 (1981)). Furthermore, the privilege to withhold information in order to protect informants is well-established. *See Roviaro v. United States,* 353 U.S. 53, 59 (1957).[7] The *Dano-*

---

[7]The *Arreguin* court, in contrast, held that the statutory disclosure requirement of § 2518(9) always trumps the informant privilege set forth in *Roviaro*. *See Arreguin*, 277 F. Supp. 2d at 1061.

*varo* court held that the information excised in that case, which had been examined in camera, was not essential to support the warrant or to show that a wiretap was necessary. 877 F.2d at 588. Because the redacted portions were not necessary, the Seventh Circuit declined to determine whether the government can redact information (with in camera review) when the information *is* essential to the validity of the warrant. *Id.* We adopt as the rule of this Circuit the Seventh Circuit's narrow rule from *Danovaro,*[8] *but we also decline to determine whether the government can redact information when that information is essential to the validity of the warrant.*

The preamble to Exhibit C states: "As noted in Exhibit B, none of the information set forth in this supplemental pleading is being submitted to establish either probable cause or necessity for the requested wiretap." The rest of the two-and-a-half page document is redacted. Exhibit B explains that

> [d]ue to the nature of the CS's cooperation with law enforcement officers and the risk to the safety of the CS if his/her identity is disclosed, I am submitting

---

[8]At least two other district courts have also found *Danovaro* more persuasive than *Arreguin*. *See United States v. Coles,* No. 05-440, 2007 WL 2916510, at *2 (E.D. Pa. Oct. 4, 2007) ("The *Arreguin* court's analysis has the appeal of simplicity, as it confines its assessment to the statutory text and draws its conclusions based on what it regards as clear Congressional intent. We do not agree with the Eastern District of California, however, that Congressional intent on this question is so self-evident. Moreover, we are concerned that the *Arreguin* court and the Defendant, to the extent he urges the adoption of its analysis, embraces a sort of formalistic approach to Title III that has been rejected by the Third Circuit."); *United States v. Freeman*, No. 06-205-03, 2008 WL 879966, at *2-3 (E.D. Pa. Mar. 31, 2008) ("Like the court in *Coles*, I find it unwise to rely solely on the textual peculiarities of Title III to conclude that Congress's intent was that the informer's privilege not apply to disclosures pursuant to § 2518(9). Consequently, I disagree with the reasoning and conclusion of *Arreguin*. Moreover, I find persuasive the reasoning of the . . . Seventh Circuit in *Danovaro* . . . .").

> details regarding the CS's background and knowledge in [Exhibit C]. For the purpose of establishing probable cause for the requested wire intercept, I am not submitting the facts and circumstances in Exhibit C; rather, I am providing the Court with the information in Exhibit C to substantiate my belief that the CS is a reliable source of information and, as addressed below, to show the limitations of the CS with respect to law enforcement's ability to achieve the goals of this investigation without the requested wiretap authorization.

Because, as discussed below, the unredacted parts of the wiretap application were more than sufficient to establish necessity, we find that the district court did not err in denying Forrester's motion for specific discovery.

## B.   § 2518's Necessity Requirement

Under 18 U.S.C. § 2518(3)(c), a judge may authorize a wiretap if the application demonstrates that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." This "necessity requirement" is intended to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).

The district court authorized the wiretap after finding that it was necessary. The 72-page wiretap application extensively detailed target subjects, the basis of information, the MDA manufacturing process, the facts establishing probable cause, and the inadequacy of traditional investigative techniques. The latter section, spanning 20 pages, explained how the use of confidential informants and undercover officers, physical surveillance, pen registers, telephone rolls, search warrants,

interviews, grand jury subpoenas, and trash searches had proven inadequate.

**[17]** Forrester argues that the application did not provide a full and complete statement regarding the government's investigatory techniques, and therefore failed to meet the necessity requirement. In fact, the wiretap application contained a full and complete statement of the facts. It described in great detail the entire course of the investigation. It described the target subjects and their backgrounds, the numerous sources of information (DEA & Bureau of Narcotics Enforcement agents, federal, state, and local drug task force officers, and the Swedish National Criminal Investigative Department, among others), the MDA manufacturing process, Forrester's trips to Sweden to visit known ecstasy manufacturers, specific chemical orders and shipments, efforts to follow Forrester to Sweden and details of his activities there, and an extensive analysis of the pen register and toll information for the target telephone. To demonstrate that traditional investigative techniques were insufficient, the affidavit described the use (and lack of success) of confidential informants, undercover officers, physical surveillance (including stationary cameras), pen registers, search warrants, interviews, and trash searches.

Based on this full and complete statement, the district court's necessity finding was not an abuse of discretion. The application carefully explains why traditional investigative techniques would not have enabled officers to achieve the goals of the investigation. For instance, it noted that one of the confidential informants knew of a clandestine lab but could not get the defendants to disclose its location. There was also some evidence that the confidential informant (CI) was receiving incorrect information, and as a drug buyer, the CI was not privy to key information about the defendants' operation. As another example, the application noted that the use of physical (camera and video) surveillance had enabled the government to identify some target subjects, confirm that

Forrester traveled to Sweden, and confirm a meeting between Forrester and Alba. However, it could not establish the identities of all coconspirators or provide evidence of the purpose and content of conspiratorial meetings. The application also listed specific investigative goals not yet achieved through the use of conventional techniques, including the identification of all coconspirators of the target subjects, the manner in which they were laundering the proceeds, and the locations where they were manufacturing and distributing the ecstasy.

Forrester's reliance on *United States v. Gonzalez, Inc.*, 412 F.3d 1102 (9th Cir. 2005), is misplaced. There, we found a lack of necessity because the government's investigation of a particular office building in question was too limited. *Id.* at 1108. "This brief investigation included: five days of pen registers . . .; an equally brief use of trap-and-trace analysis of the telephones; limited physical surveillance; and a preliminary inquiry attempt to place an undercover agent . . . ." *Id.* The investigation into Forrester and his codefendants, in comparison, went on for many months and was thorough and targeted.

**[18]** The necessity requirement was intended to ensure that wiretaps are not used as the initial step in a criminal investigation. *United States v. Giordano*, 416 U.S. 505, 515 (1974). However, officials need not exhaust every conceivable investigative technique before obtaining a wiretap. *United States v. Commito*, 918 F.2d 95, 98-99 (9th Cir. 1990); *United States v. Carneiro*, 861 F.2d 1171, 1178 (9th Cir. 1988). Based on these principles and the information contained in the wiretap application, we find that the district court did not abuse its discretion in finding that the wiretap was necessary, and denying the motion to suppress.

## C. The Fourth Amendment Wiretap Claim

Forrester argues that, even if the necessity requirement was met, the application violated the Fourth Amendment standard set forth in *Berger v. New York*, 388 U.S. 41 (1967) because

of a lack of exigent circumstances. In *Berger*, the Court held that:

> [The wiretap statute] permits uncontested entry without any showing of exigent circumstances. Such a showing of exigency, in order to avoid notice would appear more important in eavesdropping, with its inherent dangers, than that required when conventional procedures of search and seizure are utilized.

*Id*. at 60. *Berger* did not create a bright-line exigency requirement. Rather, the Court was troubled that eavesdropping had been authorized without requiring probable cause, without a description of the conversations it sought to record, and without a termination date. *Id.* at 59-60. Here, probable cause was established, the wiretap was limited to one month, and the application described the conversations and information that it sought to "seize."

**[19]** Furthermore, the Supreme Court has routinely acknowledged that § 2518 "prescribes the procedure for securing judicial authority to intercept wire communications," *Giordano*, 416 U.S. at 507, and was enacted specifically to "meet the constitutional requirements for electronic surveillance enunciated by [the Supreme Court] in [*Berger*] and *Katz v. United States*, 389 U.S. 347 (1967)," *Mitchell v. Forsyth*, 472 U.S. 511, 532 (1985) (internal quotations omitted). Therefore, we conclude that because the wiretap application met the standards set forth in § 2518, which do not require a showing of exigent circumstances, the application did not violate the Fourth Amendment.

## V.   Sentencing

### A.   Temporary Amendment to the Ecstasy Act

**[20]** The November 2000 sentencing manual provided that one gram of MDA was the equivalent of 50 grams of mari-

juana. U.S.S.G. § 2D1.1 (2000). The Ecstasy Anti-Proliferation Act of 2000 (Ecstacy Act), contained in Pub. L. 106-310, directed the Sentencing Commission to increase penalties for ecstasy. Pub. L. 106-310 §§ 3663(a), 3664. Accordingly, the Sentencing Commission promulgated a temporary amendment to § 2D1.1 that increased this ratio to 500:1, effective retroactively to May 1, 2001. The district court relied on this temporary amendment in setting the base offense level. Forrester argues that subjecting him to a heightened sentence based on a conspiracy end date that was alleged in the indictment but not admitted in the plea agreement was improper. We agree.[9]

The indictment alleges that the conspiracy continued until October 18, 2001. The indictment was reproduced in full in the plea agreement. The plea's "Factual Basis" section mentions only a beginning date, stating that "[i]n or about November, 2000, . . . Forrester entered into an agreement with Alba, and others, to manufacture and distribute" ecstacy.

[21] We have declined to treat "guilty pleas as admitting factual allegations in the indictment not essential to the government's proof of the offense." *United States v. Cazares*, 121 F.3d 1241, 1247 (9th Cir. 1997). Forrester asserts that, because "the date alleged in a section 846 indictment is not an element of the offense," the date in the indictment, even though it was replicated in his signed guilty plea, was not part of the admission. In *Cazares*, we held that the "appropriate course is not, as the government argues, for the defendant to delete this [end date] from the guilty plea, but rather, for the government at the plea colloquy to seek an explicit admission

---

[9]Forrester also argues that, even if the October 18, 2001 end date can be used for sentencing, the increased ratio of 500:1 did not become effective until November 1, 2001, at the earliest, because the temporary amendment was invalid. We need not reach this issue because we remand for resentencing under the November 2000 Guidelines 50:1 ratio for the reasons set forth in this section.

of any unlawful conduct which it seeks to attribute to the defendant." *Id.* at 1248 (internal quotation marks omitted). There is no mention of an end date in the plea agreement, nor did Forrester admit to one at the plea colloquy.

In *Cezares*, we held that, "having failed to [seek an explicit admission], the government must follow the normal procedure of proving relevant conduct at sentencing by a preponderance of the evidence." *Id.* at 1248. However, this case differs from *Cezares* in one crucial way—Forrester's plea failed to include the end date of the conspiracy, whereas Cezares's plea failed to mention an "overt act" (specifically, gun possession). *See id.* at 1247-48.

This distinction is critical because, unlike an overt act, the end date of a conspiracy carries ex post facto implications.[10] The Ex Post Facto Clause bars the retroactive application of "enactments which . . . increase the punishment for a crime after its commission." *Garner v. Jones*, 529 U.S. 244, 249 (2000). Therefore, in cases where application of the Guidelines version in existence at sentencing would impose a harsher punishment than would the version in effect when the offense was committed, the court "shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11. In this case, the distinction is not between the sentencing date and the date of the offense, but between two possible dates of the offense. Here, Forrester admitted to a beginning date for the conspiracy that precedes the Guidelines amendment (November 2000), and the government alleged an end date that is after the amendment (October 18, 2001). Because the end date of the conspiracy was not pled to or found by a jury, this case presents a

---

[10]There may be some cases in which the resolution of a disputed conspiracy end date would not affect which Guidelines version applies, or, if it did, where the various potential Guidelines versions do not offer differing punishments for the crime at issue. In those cases, unlike here, the end date of a conspiracy would not have ex post facto implications.

novel issue in this court: whether the end date of a conspiracy can be treated as relevant conduct, which in turn will determine which Guidelines version applies.

**[22]** Unlike an overt act, the end date of a conspiracy with ex post facto concerns is not "relevant conduct" within the definition of U.S.S.G. § 1B1.3. Relevant conduct is used to determine the sentencing range *within* a particular version of the Guidelines. *See* U.S.S.G. § 1B1.3 (indicating that "Relevant Conduct" is synonymous with "Factors that Determine the Guideline Range," and using both terms interchangeably in the section heading). By contrast, the end date of a conspiracy determines which *version* of the Guidelines applies. The Guidelines make clear that a conspiracy end date with ex post facto implications is not relevant conduct. Indeed, the Guidelines expressly distinguish between the last date of offense conduct and the relevant conduct. *See* U.S.S.G. 1B1.11 cmt. n.2 ("[T]he last date of the offense of conviction is the controlling date for *ex post facto* purposes. . . . This is true even if the defendant's conduct relevant to the determination of the Guidelines range under § 1B1.3 (Relevant Conduct) included an act that occurred . . . after a revised Guidelines Manual took effect."). Treating the conspiracy end date as relevant conduct would ignore the Guidelines text. *Id.*; *see also United States v. Aviles*, 518 F.3d 1228, 1232 (11th Cir. 2008) ("The Guidelines clearly distinguish between the dates to be considered for ex post facto concerns and those dates related to relevant conduct."); *United States v. Bennett*, 37 F.3d 687, 699 (1st Cir. 1994) ("[Section 1B1.11] requires district courts to determine the last date of the offense of conviction. In so doing, they must necessarily distinguish 'the conduct charged in the count of the indictment . . . of which the defendant was convicted' from relevant conduct, which is immaterial for ex post facto purposes." (citing U.S.S.G. § 1B1.11 cmt. n.2)). Therefore, caselaw sanctioning a preponderance of the evidence standard to determinations of relevant conduct are inapposite. *See, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010); *cf. United States v. Foote*, 413 F.3d

1240 (10th Cir. 2005) (reversing district court's application of later 2000 Guidelines version where district court concluded that conspiracy continued past 2000 by a preponderance of the evidence).[11]

**[23]** Judge Hall correctly notes that findings regarding the end date of a conspiracy seem to be in a "peculiar limbo" because they do not fit precisely within the definition of either offense conduct (because the end date is not an element of the crime) or relevant conduct (because the end date determines which Guidelines version applies). *See* Dissent at 10955. However, even if the end date of the conspiracy could be construed as "relevant conduct," relevant conduct may not be used to justify the application of a later Guidelines version. *See* U.S.S.G. § 1B1.11 cmt. n.2; *see also id.* § 1B1.11(b)(1) ("If the court determines that the use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause . . . , the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.").

Either the end date of the conspiracy is not relevant con-

---

[11]In her dissent, Judge Hall claims that *Foote* "aptly demonstrates the operation of Section 1B1.11," and we agree that it is instructive. Dissent at 10953. However, Judge Hall later tries to distinguish *Foote* by reasoning that, "[u]nlike in *Foote*, . . . [t]here is no need to distinguish between conduct that supported Forrester's conspiracy conviction and conduct that did not in order to determine which version of the Guidelines should apply." Dissent at 10953. This distinction is unsound: in both cases, the government sought to use conduct that did not support the conspiracy conviction to apply a later Guidelines version. The substantive issue in both cases is that the end date of the conspiracy determines which guidelines will apply, thus triggering ex post facto concerns. Under such circumstances, "the Guidelines clearly distinguish between the dates to be considered for ex post facto concerns and those dates related to relevant conduct," *Aviles*, 518 F.3d at 1232; *see also id.*(highlighting the difference between an "ex post facto analysis" and a "relevant-conduct analysis" and remanding for the district court to "use the appropriate Guidelines Manual under an ex post facto analysis").

duct, and is therefore subject to ex post facto analysis rather than the relevant conduct preponderance standard, or it is relevant conduct, in which case it cannot be used to justify application of a later Guidelines version. Either way, the dissent's inclination to treat the end date as relevant conduct, and to use that relevant conduct to justify the application of the later Guidelines version, violates the ex post facto clause.[12] *See* U.S.S.G. § 1B1.11(b)(1).

**[24]** Therefore, because the Guidelines clearly, if not explicitly, indicate that the end date of an offense is in a category of its own for ex post facto purposes, which seems to preclude treating the end date as relevant conduct, U.S.S.G. § 1B1.11 n.2, and *certainly* precludes using relevant conduct to determine which Guidelines to apply, *id*, we remand to the district court for resentencing under the November 2000 Guidelines.

### B.  Estimating Ecstasy Quantities

**[25]** Under the Sentencing Guidelines, "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense," a district court may estimate the quantity of the drug and may consider "the size or capability of any laboratory involved." U.S.S.G. § 2D1.1 cmt. n.12; *see also United States v. Putney*, 906 F.2d 477, 479 (9th Cir. 1990). The government recommended a base offense level of 38 premised on (1) a "theoretical maximum yield" (TMY) of 183.6 kilograms (kilos) of ecstasy, as calculated by DEA chemist Skinner, (2)

---

[12]To the extent there is any ambiguity as to whether the end date can be used to justify the application of a harsher Guidelines version, we must tend toward a resolution that protects the defendant's established constitutional rights. *Cf. United States v. Santos*, 128 S. Ct. 2020, 2025 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."). As Judge Hall notes, applying the later Guidelines version would increase Forrester's offense level by four points, or approximately 5-15 years in prison. Dissent at 10954 n.2.

an "actual yield" of 63.1 kilos of ecstasy, also calculated by Skinner, and (3) a detailed "business plan" discovered at the ecstasy laboratory suggesting that the conspiracy intended to produce 440 kilos of ecstasy. Forrester argues that the conspiracy involved less than 60 kilos of ecstasy and that the appropriate base level (using the 50:1 ratio) was 32. The district court applied the 500:1 ratio and, without making specific findings as to the precise quantity of ecstasy involved, concluded that the base offense level was 38.

### 1. Insufficient Findings as to the Amount of Ecstasy Involved

Forrester claims that the district court failed to make specific findings regarding the parties' factual disputes about the amount of ecstasy involved, in violation of Federal Rule of Criminal Procedure 32. In *United States v. Carter*, we held that "[f]or each disputed fact upon which the district court intends to rely in imposing the sentence, the district court must make an explicit factual finding that resolves the dispute [or] must clearly state that the disputed fact was not taken into account . . . ." 219 F.3d 863, 867 (9th Cir. 2000).

Here, the district court held a lengthy hearing in which the government presented evidence about the estimated yield, which led to an extensive exchange between the parties regarding the chemist's theoretical yield estimate, the PSR, the reliability of Alba's statement corroborating that estimate, and Alba's business plan indicating that the goal of the conspiracy was to manufacture 440 kilos of ecstasy per month. The district court must rule on each of these disputed facts individually. *See id.* at 866-67. In doing so, the court ensures meaningful appellate review and avoids "the unfairness that would result to a defendant if prison or parole officials were to rely on false allegations or uncorrected reports." *Id*. at 866.

[26] The district judge calculated a base level offense of 38 based on the "testimony of the chemist at trial, the grafts that

were seized from the lab up there, and just tangentially the fact that the Ninth Circuit actually upheld the same base offense level in Mr. Alba's case."[13] Although the sentencing hearing was very thorough, a specific finding was not made as to the amount of ecstasy involved in the conspiracy.[14] While a base offense level of 38 may well have been reasonable, that particular level applies to a range of quantities beginning at 60 kilos, so it cannot be used as a proxy for an exact finding as to the amount of ecstasy involved in this case.

[27] Since this case is being remanded for additional findings as to the end date of the conspiracy, we also direct that the district court make explicit findings on all contested issues raised at sentencing, the most important of which is the amount of ecstasy involved in the conspiracy.

## 2.   The Amount of Ecstasy Involved

Although the district court did not make explicit findings as to the amount of ecstasy involved, it necessarily relied on some implicit finding of quantity in determining the base offense level. There are three criteria for approximations of drug quantity. *United States v. Kilby*, 443 F.3d 1135, 1141 (9th Cir. 2006).

> First, the government is required to prove the approximate quantity by a preponderance of the evidence . . . which means that the district court must conclude that the defendant is more likely than not actually responsible for a quantity greater than or

---

[13]The finding that "the Ninth Circuit actually upheld the same base offense level" for Alba was erroneous. That issue was not raised on appeal in *Forrester I*. This error demonstrates the importance of having each finding explained so that its merits can be assessed later.

[14]The lack of a specific finding as to the amount of ecstasy has, in turn, hampered us in determining whether the appropriate drug estimation method was used.

equal to the quantity for which the defendant is being held responsible. Second, the information which supports an approximation must possess sufficient indicia of reliability to support its probable accuracy. Third, since the sentence depends in large part upon the amount of drugs . . . and approximation is by definition imprecise, the district court must err on the side of caution in approximating the drug quantity.

*Id.* (internal quotation marks omitted).

We have repeatedly held that a court must "err on the side of caution" when estimating drug quantity, *Chase*, 499 F.3d at 1069, and when there are two "equally good measures" for making a calculation under the Guidelines, a court must select the one "bringing the less punishment," *United States v. Hardy*, 289 F.3d 608, 614 (9th Cir. 2002). We have also discouraged the use of a TMY analysis, and in individual cases have deemed it an inappropriate methodology to calculate drug quantity. *Chase*, 499 F.3d at 1069 ("the relevant inquiry [is] not what a theoretical maximum yield would be").[15] In theory, the TMY would be permissible in the absence of more conservative, equally reliable estimates. Where a lower approximation is an "equally good measure," however, a rule calling for a conservative estimate is likely to be incongruous with a method that calculates *maximum* yield.[16]

---

[15]Forrester observes that the TMY result is particularly suspect in this case because, "according to the government, the conspiracy was only able to manufacture 24.6 kilos during the preceding year, but it would then suddenly produce 159 kilos with the seized chemicals."

[16]Theoretical yield calculations are clearly permissible; it is the use of a *maximum* theoretical estimate that is problematic. *See, e.g.*, *United States v. Williams*, 989 F.2d 1061, 1073 n.5 (using the lower estimate of a theoretical range); *United States v. August*, 86 F.3d 151, 153 (9th Cir. 1996) (same); *United States v. Basinger*, 60 F.3d 1400, 1410 n.5 (9th Cir. 1995) (explicitly "minimiz[ing] the potential for overestimating drug quantity by adopting the expert's most conservative figure").

Here, the government's expert, DEA chemist Skinner, testified that one of his calculations was a maximum theoretical yield of 183.6 kilos of ecstasy. In *Chase*, the government's expert had "quite candidly admitted that his calculation was a maximum theoretical yield," an approach that this court found "unreliable as a method of estimating how much methamphetamine [the defendant] produced." *Id.* However, Skinner also testified that "there is a wide range in the yield . . . from lab to lab," and that he had also calculated a substantially lower "actual yield" of 63.1 kilos of ecstasy based upon the quantities of seized materials. The actual yield assumed that Forrester's lab could achieve a "conservative" 50% yield at each reaction state from the seized precursor chemicals, instead of the 100% yield assumed in the TMY calculation. The chemist based his estimates to some extent on his conversation with Forrester's co-conspirator Alba. The district judge indicated that he had calculated the base offense level of 38 relying on, among other things, the testimony of the government's chemist, but did not specify on which of the two estimates he was relying.

**[28]** Since the district court did not make any explicit findings about the amount of ecstasy involved when it imposed a base offense level of 38, we need not reach the question of whether the court relied on an improper method of calculating the amount of ecstasy. However, we note that when there are two reasonable methods of calculation, the district court should select the measure that brings the lesser punishment, *Hardy*, 289 F.3d at 614. Therefore unless, on remand, the district court's findings show that the TMY was the most reliable method available to calculate the amount of ecstasy, the 183.6 estimate is likely too high.

Forrester also claims that his sentence was substantively unreasonable under 18 U.S.C. § 3553(a), but we decline to reach this issue because we are remanding for resentencing.

## *CONCLUSION*

**[29]** For the foregoing reasons, we AFFIRM Forrester's conviction, VACATE his sentence, and REMAND for resentencing under the November 2000 Sentencing Guidelines.

---

HALL, Ciruict Judge, concurring in part and dissenting in part

I dissent in part from Section V(A) of the amended majority opinion. The majority improperly remands for resentencing under the November 2000 Guidelines without providing any opportunity for the district court to make a factual finding regarding the end date of the conspiracy to manufacture and distribute ecstasy.

I.

If Forrester's case had gone to trial, a jury would not have needed to determine an end date of the conspiracy in order to convict, and I therefore agree with the majority that the end date was not an "element" of Forrester's offense of conviction encompassed by his guilty plea. *See* Amended Maj. Op. at 10942. At sentencing, however, it was necessary for the district court to determine an end date of the offense of conviction because that date would determine which version of the Sentencing Guidelines applies to Forrester. In our initial opinion, we accordingly remanded for further fact-finding and directed the government "to follow the normal procedure of proving relevant conduct at sentencing by a preponderance of the evidence." *United States v. Forrester*, 592 F.3d 972, 988 (9th Cir. 2010) (quoting *United States v. Cazares*, 121 F.3d 1241, 1248 (9th Cir. 1997)).

The majority now concludes that the initial remand order was improper because, for purposes of an Ex Post Facto anal-

ysis, the Sentencing Guidelines draw a distinction between "the last date of the offense of conviction"—here the end date of the ecstasy conspiracy—and the last date of "relevant conduct." U.S.S.G. § 1B1.11 cmt. n. 2. The amended majority opinion states (1) that "the end date of a conspiracy with ex post facto concerns is not 'relevant conduct' within the definition of U.S.S.G. § 1B1.3," Amended Maj. Op. at 10944, (2) "caselaw sanctioning a preponderance of the evidence standard to determinations of relevant conduct [is] inapposite," *id.* at 36, and (3) "[t]herefore, because the Guidelines clearly, if not explicitly, indicate that the end date of an offense is in a category of its own for ex post facto purposes . . . we remand to the district court for resentencing under the November 2000 Guidelines," *id.* at 10944. The majority provides no opportunity for the district court to make a factual finding regarding the end date of the conspiracy, under any standard of proof.

## II.

In order to determine whether the use of a particular version of the Guidelines violates the Ex Post Facto Clause, the district court must look only to the end date of the offense of conviction. U.S.S.G. § 1B1.11 cmt n.2. It may not consider conduct that does not underlie defendant's conviction, even if that conduct is relevant to determining the applicable Guidelines range. *Id.* This distinction made in Section 1B1.11 between the end date of offense conduct and the end date of "relevant conduct" does not mean that the district court cannot determine the end date of offense conduct under the usual preponderance of the evidence standard, and it certainly does not mean that the district court must accept defendant's proffered end date at face value.[1] All this distinction means is that,

---

[1]The majority improperly frames the question in this case as "whether the end date of a conspiracy can be treated as relevant conduct, which [in] turn will determine which Guidelines version applies." Amended Maj. Op. at 10944. Instead, the question is what standard of proof a district court should apply in determining the end date of a conspiracy at sentencing, where a defendant's guilty plea does not expressly address the issue.

given two different potential end dates at sentencing, the dispositive date is when the conduct supporting the conviction terminated.

A Tenth Circuit decision cited by Forrester aptly demonstrates the operation of Section 1B1.11. In *United States v. Foote*, 413 F.3d 1240, 1250 (10th Cir. 2005), defendant was convicted of conspiring to sell counterfeit Mont Blanc pens. It was undisputed that the Mont Blanc conspiracy terminated on December 7, 1998. Defendant, however, was also indicted for conspiring to sell a wide range of other counterfeit goods, and the district court determined that the sale of these goods (for which defendant was not convicted), continued until May 18, 2000. Given these two dates, the district court incorrectly applied the Sentencing Guidelines in effect May 2000, and the Tenth Circuit remanded for resentencing under the version in effect December 1998.

Unlike in *Foote*, in this case we are not faced with the scenario envisioned by Comment 2 of § 1B1.11. There is no need to distinguish between conduct that supported Forrester's conspiracy conviction and conduct that did not in order to determine which version of the Guidelines should apply. The district court must simply determine when the conspiracy to manufacture and distribute ecstasy terminated in light of the evidence presented by the parties, and this fact should be determined under the normal preponderance of the evidence standard. *See United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010) ("Ordinarily, a district court uses a preponderance of the evidence standard of proof when finding facts at sentencing . . .").

We have previously held that a district court may determine the "extent" of a conspiracy by a preponderance of the evidence, *see id.* at 1001; *United States v. Riley*, 335 F.3d 919, 926-27 (9th Cir. 2003); *United States v. Harrison-Philpot*, 978 F.2d 1520, 1523 (9th Cir. 1992), and it seems strange to conclude that the "extent" of a conspiracy does not include its

duration. There are no cases in this circuit precluding a preponderance standard for determining the end date of a conspiracy, and a decision by the Eleventh Circuit expressly sanctions this approach. *See United States v. Masferrer*, 514 F.3d 1158, 1163-64 (11th Cir. 2008) (where jury verdict did not establish end date of conspiracy, at sentencing "the court was simply required to find by a preponderance of the evidence that Masferrer conspired to obstruct the SEC in 2002" in order to apply the 2001 version of the Sentencing Guidelines Manual).

The majority provides no explanation for why an "ex post facto analysis," Amended Maj. Op. at 10946, precludes fact-finding under a preponderance of the evidence standard, or for that matter under any other standard of proof. Where serious constitutional concerns have been raised by fact-finding in previous cases, we have simply ratcheted up the standard of proof at sentencing; we have not prohibited fact-finding altogether. *See United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007) (where fact-finding at sentencing resulted in an "extremely disproportionate sentence," requiring the government to satisfy a "clear and convincing" standard or proof); *United States v. Staten*, 466 F.3d 708, 717 (9th Cir. 2006) (requiring clear and convincing standard where factual finding resulted in fifteen-level enhancement). We have, however, reserved even a modestly heightened standard of proof for particularly egregious case. Even in the face of indisputably serious sentencing consequences, we have concluded that the normal preponderance standard should apply. *See Treadwell*, 593 F.3d at 1001 (rejecting defendant's argument that a clear and convincing standard applies, notwithstanding a 22-level increase in the Guidelines range). If constitutional due process only requires a preponderance standard where a factual determination increases the Guidelines range by 24-31 years, *see id.* at n. 8, Ex Post Facto concerns in this case cannot completely deprive the district court of its fact-finding authority.[2]

---

[2]The Temporary Amendment to the Ecstasy Act increases Forrester's total offense level by four points, or approximately 5-15 years in prison, depending on the quantity of ecstasy found to be involved in the conspiracy.

## III.

The majority's analysis is also in tension with our holding that the end date of the conspiracy is not an element of Forrester's offense of conviction. On one hand, the end date of the conspiracy is not a fact necessary for conviction, and we hold that Forrester's guilty plea leaves open the issue of when the conspiracy terminated for purposes of sentencing. On the other hand, the majority prohibits the district court from making a factual finding on that issue. The net effect seems to be that the end date of the conspiracy is in a peculiar limbo where it is not reached either by a jury conviction, by a guilty plea (unless explicitly pled), or by a district judge at sentencing. Forrester broadly declares that the conspiracy did not last until the effective date of Temporary Amendment, and under the majority's analysis the district court may not consider the government's evidence to contrary. I see no compelling reason for hamstringing Forrester's prosecution and sentencing with such an anomalous result, and I stand by our initial conclusion that the district court should be permitted to make its requisite factual findings by the normal preponderance of the evidence standard.

## IV.

For the foregoing reasons, I dissent in part from the amended majority opinion.